### In re Y.S. and J.A.H.

C.P. of Berks County, nos. 81056 and 81057.

*Jennifer L. Grimes,* for Berks County CYS.
*Wendie L. Ziegler, guardian ad litem* for Y.S. and J.A.H.
*Jonn J. Grenko,* for Y.H.

SCHMEHL, *J.,* September 1, 2010—This matter came before the court on petition by the Berks County Children & Youth Services (BCCYS) to terminate the parental rights of Y.H. (Mother) to the children Y.S., date of birth November 21, 2001, and J.A.H., date of birth September

18, 2007.* The petitions were filed on the grounds set forth in 23 Pa.C.S. §2511(a)(1), (2), (5) and (8). Following the hearing on July 19, 2010, at which Mother was present with court-appointed counsel, the court terminated Mother's rights to the children. Mother filed a timely appeal.

Paragraph 2511(a)(1) provides that parental rights in regard to a child may be terminated on the grounds that a "parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Paragraph (a)(2) provides that parental rights may be terminated on the grounds that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." Paragraph (a)(5) provides for termination of parental rights when a "child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the re-

---

*Mother has a third child, Y.H., date of birth December 31, 2003, that is not subject to these proceedings because that child has been transferred to the custody of his father. All three of Mother's children are by different men.

moval or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child." Paragraph (a)(8) provides that parental rights may be terminated on the grounds that "[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child."

The family first came to the attention of BCCYS on May 8, 2003 when the agency received a report that Mother tossed Y.S. onto a hospital couch while waiting for a mental health evaluation. Mother admitted that she threw her daughter because she was mad at her. A second anonymous report was received on September 26, 2003 stating that Mother abuses her children physically. The case remained closed due to the lack of specific allegations. The next incident report occurred on April 28, 2005 when the agency was advised that Mother did not supervise the children and that the children were seen hanging out the window. There were also concerns that Mother and her then boyfriend were abusing drugs. On July 12, 2005, the agency received a report that Mother's boyfriend was observed to have been grabbing Y.S. and threatening, with details, to kill the child. The agency referred the family to the Youth Advocate Program for casework counseling, parenting education, and family support services; however, the case remained closed.

On August 18, 2005, the agency received a report that the family was receiving services from Child Family

Support Services, that Y.S. was totally out of control, disrespectful, and destructive and that Mother and her boyfriend could not parent the child. The referent suggested that the child should be placed by BCCYS to assure the child's safety. During an ensuing investigation, there was concern that Mother's boyfriend engaged in inappropriate touching of Y.S., then age three, but due to the child's poor communication skills and inability to confirm or deny inappropriate contact, the report was unfounded. Mother was advised to not allow boyfriend any unsupervised contact with the children; however, he was observed to be in her home with the children when she was not home. Mother was referred to Service Access Management for wrap-around services and the family was open for general protective services.

For the next year to year-and-a-half, Mother and family participated in casework services, family based services, mental health treatment, transportation assistance, parenting education, and supportive services. For a period of time, Mother was compliant and even reported breaking off her relationship with her boyfriend; however, problems did continue.

On March 15, 2006, a 27- inch television fell on Y.S.'s ankle because the child was playing with the television cart. The family was referred for casework services, parenting instruction, and supportive services. Mother was hostile and uncooperative, complaining that she did not need the services but, rather, the child was the problem. Mother was easily frustrated and became angry when asked to do something that she did not want to do.

On December 14, 2006, the agency received a report that the child had been jumping on a couch and fell.

Mother did not take the child to the doctor until the following day. Y.S.'s arm was broken and required surgery. On January 9, 2007, the agency received a report that Y.S. fell off of the bed onto a metal frame, causing a need for stitches. The referent expressed concern that having two special needs children residing with Mother, who was herself limited, was a safety issue. On the same day, it was also reported that Mother had failed to ensure Y.S.'s attendance at necessary therapy appointments. The child's therapist reported that Mother "does not get it" and the therapist was afraid the child was going to hurt herself badly one day. Mother did not seem to understand her own limited capacity and blamed the 5-year-old child for not being potty-trained.

January 2007 brought a series of incident reports reflecting foul behavior and language from Y.S. directed toward peers and staff at the Second Street Learning Center. Mother was reported as swearing at teachers and directing that nobody forces Y.S. to do anything. Mother threw a temper tantrum at the Public Welfare Office on March 29, 2007 and admitted that she was pregnant, overwhelmed, and unable to control the children's behaviors. She subsequently signed a voluntary 30-day placement agreement. Despite being provided various support services over a year-and-a-half, it was apparent that Mother was unable to utilize or grasp any of the parenting techniques offered.

On April 30, 2007, it was reported that the children had been locked in a closet while in their mother's care and that Y.S. slept in the closet on multiple occasions. Y.S. displayed physically aggressive behaviors warranting mental health treatment at a young age, but Mother did not ensure her participating in mental health services

due to her failure to attend all scheduled appointments. Mother also failed to follow any directives or recommendations made by the therapists, family specialists, or parenting educators. Over time, Mother became increasingly uncooperative and hostile. It was clear that she was unable to manage the children's behaviors.

A dependency hearing was held on April 25, 2007. Mother was present with counsel. The court concluded that Y.S. was a dependent child and legal custody was transferred to BCCYS for placement purposes. Visitation was to be at the discretion of BCCYS in consultation with the child's guardian ad litem. Mother was ordered to cooperate with a variety of services, including casework, mental health evaluation and treatment, and parenting education.

On September 18, 2007, Mother gave birth to her third child, J.A.H. Upon the child's release from the hospital, he was placed in foster care with his maternal grandmother. Mother again signed a voluntary 30 day placement agreement. On October 10, 2007, J.A.H. was adjudicated dependent, with temporary legal custody transferred to BCCYS for placement purposes. Mother was again ordered to cooperate with a variety of services.

Between September 2, 2008 and June 1, 2010, a number of permanency review hearings were held. At each hearing, it was determined that Mother had made minimal progress toward alleviating the circumstances which necessitated the original placement. Throughout this time period, the primary permanency goal was return to home with a concurrent goal of place in adoption.

Throughout the history of this case, Mother has not maintained stable housing, employment or relationships. Since February 2009, she has had five addresses, and up to the date of the hearing BCCYS was not aware of her current whereabouts. She was often behind on her rent and she lost welfare benefits due to a failure to attend an education program sponsored by the department of public welfare. She has had a poor history with men and typically became involved with men with extensive histories of crime and domestic violence.

While Mother was very compliant in keeping all of her casework counseling appointments in 2006, she did not maintain compliance with the Department of Public Welfare, mental health evaluations, wrap around services, and Social Security benefits. Mother demonstrated great difficulty gaining control of her children. The home lacked structure and consistent and appropriate discipline practices. Mother was not receptive to suggestions by her caseworker and slowly deteriorated in her compliance and ability to recall information. Y.S. was still in diapers at the age of 5.

In 2007, Mother continued to participate in casework services, but her progress continued to be poor. She continued to have difficulty controlling her children and continued to fail to respond to suggestions on how to redirect her children. Signature Family Services scheduled multiple appointments at various providers to obtain mental health services for Y.S., but Mother continually cancelled the appointments. In 2008, the caseworker documented many attempts to assist Mother in accessing community resources; however, Mother was resistant. She began to exhibit increasingly hostile behaviors and

failed to recognize what services she needed to remediate the reasons that her children were removed from her care.

Initially, Mother was resistant to mental health treatment and refused to engage in services. Over time, she attended services but made minimal progress due to her intellectual and mental health limitations impairing her ability to absorb and utilize coping skills. A psychological evaluation completed in February 2008 revealed Mother to be a "slow learner" with a third grade reading ability. She has an IQ of 70. She struggles with identifying problems and exhibits nonconforming behaviors. She has had a difficult time understanding why her children were removed from her care, and because of her underlying antisocial personality she is either unable or unwilling to remediate the conditions which caused the children to be removed from her care. The Ph.D. evaluator believed that Mother would have significant difficulty being an effective parent, even with very intensive parenting classes.

In July 2008, Mother participated in a bonding evaluation with Y.S., which revealed that the mother/daughter relationship was "clearly very negative in nature." Mother displayed a minimal level of attachment to Y.S. Furthermore, Mother's below average cognitive abilities were found to interfere with her being able to exercise appropriate judgment and make appropriate decisions. Mother displayed significant memory deficits, anger management issues, and a lack of motivation to work toward life goals. The evaluator recommended that Y.S. not be returned to Mother's care and that visitation be gradually diminished to the point of cessation.

Throughout the course of Mother's participation in parenting instruction and supervised visitation, it was clear that Mother was unable to manage Y.S's behaviors or follow the visit supervisor's recommendations. Over time, the quality of visitation went from good to fair to poor. Mother was unable to internalize parenting concepts and be consistent in her parenting style.

Y.S. was identified as a special needs child at age two. While still having difficulties, she has made significant social and emotional strides and her therapist has described her progress as amazing. She continues to make progress and have a positive adjustment in her placement setting. J.A.H. is described as a happy, lovable child who has been in placement with his maternal grandmother since birth. He is very comfortable in his home.

It is clear to the court that Mother has been unable to perform her parental duties. She is unable to control the behaviors of the children, to comprehend and implement recommended parenting techniques, and to control her aggression. The children are doing as well as can be expected in their placement settings. Giving primary consideration to the children's developmental, physical and emotional needs and welfare, it is clear to the court that Mother's parental rights must be terminated. After years of services, Mother has made no progress in remedying the conditions leading to the children's placement and giving her more time will only infringe upon the children's right to fulfillment of their potential in a permanent, healthy, safe environment.

For the foregoing reasons, the court entered its order of July 19, 2010 terminating the parental rights of Mother to the children, Y.S. and J.A.H.